UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| REGINA LEE, | § | |
|     Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. C-09-190 |
| | § | |
| CITY OF CORPUS CHRISTI, | § | |
|     Defendant | § | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

Plaintiff Regina Lee filed this lawsuit pursuant to 42 U.S.C. §§ 1981 and 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII), on August 5, 2009, alleging that her employer, the City of Corpus Christi ("the City"), discriminated against her on the basis of race and retaliated against her when she complained about the discrimination (D.E. 1, 5).  Defendant filed a motion for summary judgment on June 7, 2010 to which plaintiff responded on June 28, 2010 (D.E. 18, 19). Defendant filed a reply to the response on July 13, 2010 (D.E. 22).

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

## BACKGROUND

This recitation of facts is taken from the pleadings and supporting documents viewed in the light most favorable to plaintiff.  Plaintiff is an African-American woman who was hired to work for the City in August 2003.  Her title was Administrative Manager and her pay grade was 615 (Affidavit of Regina Lee, Resp. to Mo. Sum. Jmt.,

Ex. C, D.E. 19-3, para 1; New Hire form, Affidavit of Cynthia Garcia, Att. C, D.E. 18-3,

p. 31).  Her initial salary was $37,788 per year (Salary history of Regina Lee, D.E. 19-16,

p. 4).  At the time she was hired, plaintiff was told that she would deal exclusively with

the Skill Based Pay ("SBP") program[1] in the Water Utilities departments (Lee Aff., D.E.

19-3, para. 2).  There were about 100 SBP employees and 300 non-SBP employees when

plaintiff began at the City (Lee Aff., D.E. 19-3, para. 3).  Plaintiff's immediate supervisor

was Ed Garana, the Director of Water Operations.

Plaintiff's position was described in the vacancy notice as "Administrative

Manager ILO Superintendent of Administration." (Pos. Vac. Notice, Garcia Aff., Att. B,

D.E. 18-3, p. 27).  "ILO" stands for "in lieu of."  Previously, the position had been known

as the Superintendent of Administration and was held by Ed Garcia until he retired.  The

funding for the empty Superintendent of Administration position was used to fund the

Administrative Manager position (Deposition of Cynthia Garcia, D.E. 19-5, p. 119; Lee

Aff., D.E. 19-3, para. 4).  When Garcia was in the Superintendent position, the pay grade

was 616 and his ending salary was $62,221 annually (Salary history of Eduardo Garcia,

D.E. 19-6, p. 4).  Plaintiff was told that she was hired to replace Ed Garcia and to perform

---

[1]The Skill Based Pay program is a compensation program the City uses with labor-intensive jobs that lend themselves to multiple skills.  Employees learn skills throughout their career, learning particular subsets of skills during a set time period.  As employees learn more skill sets, their salaries increase.  The purpose of the program is to have multiple employees trained in multiple areas.  Employees from water, waste water, storm water, gas and the parks and recreation department participate in the program (Garcia Depo., D.E. 19-5, pp. 13-14).

his duties (Lee Aff., D.E. 19-3, para. 5).  She was not told that her position was intended to be in lieu of the Superintendent position, although the "new hire" form describes her title as Administrative Manager (Lee Aff., D.E. 19-3, para. 5; New Hire form, D.E. 18-3, p. 31).

Plaintiff performed the same duties Ed Garcia had performed including all the superintendent work for three departments with a total of 400 employees.  Plaintiff also performed duties outside her job description (Lee Aff., D.E. 19-3, paras. 6-7; Job Descrip., D.E. 19-3, p. 11).

Because she believed she was doing work outside her job description, plaintiff submitted a job description questionnaire ("JDQ") to the job evaluation team ("JET").  A JDQ is used to establish the functions, roles and responsibilities of a position (Deposition of Emily Martinez, D.E. 19-4, p. 15).  When a job evolves, a JDQ is often prepared as a means of having a job reclassified at a higher pay grade (Id. at 18-20).  The JET evaluates JDQ's (Id. at 18).  Members of the JET are primarily executive level employees of the City appointed by the City Manager (Id. at 21, 23).  The JET discusses the responsibilities of the job and is not supposed to consider any other information (Id. at 28-29).

As administrator of human resources, Emily Martinez facilitated the JETs until October 2007 (Id. at 21-22).  She would receive the JDQ's from the department heads and seek clarification for any questions she anticipated the JET would have (Id. at 31-32).  Martinez did not discuss with the JET anything a department director told her about the position (Id. at 32-33).  Generally, once a completed JDQ is submitted to the JET, it is

acted upon within two weeks (Id. at 41).  Sometimes delays occur when someone in the chain of command for the requesting employee has a question about the JDQ (Id. at 43-44).  The JDQ is not sent to the JET until it is completed and ready for review, although the JET may still have questions or seek clarification (Id. at 53-56).  Martinez did not give her opinion on any matter to the JET, but only supplied them with factual information (Id. at 56).

Plaintiff submitted her JDQ in March 2004, but it was not reviewed at that time (Id. at 46-47; Memo from Eduardo Garana, Garcia Aff., Att. D, D.E. 18-3, p. 32).  Martinez talked to plaintiff's supervisor, Garana, about plaintiff's JDQ at some point, but did not remember when they talked or the subject of their conversation (Martinez Depo., D.E. 19-4, pp. 50-51).  In August 2004 Garana sent a memo to Cynthia Garcia, the director of human resources, asking that plaintiff's position be reclassified because the current JDQ did not represent her current job duties.  He suggested she be reclassified to Superintendent of Administration at the pay grade of 618 (Memo from Eduardo Garana, Ex. 12 to Garcia Depo., D.E. 19-12, p. 2).  Despite the fact that Garana sent the request for reclassification, he told Garcia that plaintiff did not need to be reclassified (Garcia Depo., D.E. 19-5, pp. 87-88; Email dated June 27, 2005, D.E. 19-13, Ex. M).

On September 9, 2004 plaintiff sent Martinez an e-mail telling her that Garcia had detailed several changes with the JDQ.  Plaintiff informed Martinez that she would make the changes and submit the revised JDQ before the next JET meeting (Ex. 4 to Martinez Depo., D.E. 19-4, p. 29).  On October 8, 2004, Martinez e-mailed plaintiff telling her that

4

the position was pulled from the JET team agenda pending further discussion with Oscar Martinez and Ron Massey, the assistant city manager.  Garcia wanted to discuss the position with Martinez (Ex. 7 to Martinez Depo., D.E. 19-4, p. 30).  Plaintiff's JDQ was not reviewed by the JET until December 2004 (Martinez Depo., D.E. 19-4, p. 107).  The JET denied plaintiff's request for reclassification on December 20, 2004 (Garcia Aff., D.E. 18-3, para 5).

Plaintiff also worked on a re-engineering project for several months, which encompassed many duties outside her job description (Lee Aff., D.E. 19-3, para. 9).  She submitted a JDQ for the project but it was never acted upon (Id.).  Plaintiff also requested "acting pay"[2] for working on the project but Garana ignored her request (Id.).  Other non-black employees working on the project received acting pay (Lee Aff., D.E. 19-3, paras. 9-10; Special Pay documents, att. as Ex. H to Garcia Aff., D.E. 18-3, pp. 39-81).  Plaintiff stopped working on the re-engineering project in January 2005 (Report of Ruthie Caraway, att. to Aff. of Ruthie Caraway, D.E. 19-8, paras. 11-12).

In August 2005 plaintiff's job title was changed in the City's computer system from Superintendent of Administration to Administrative Manager.  Although the change should have been accompanied with a written form, no form was produced (Martinez Depo., D.E. 19-4, pp. 117-120).  Plaintiff was not told of the change at the time it

_____

[2]"Acting pay" is additional compensation paid to employees based on work assignment changes.  "Acting pay" includes "Acting-in-Charge Pay," "Special Assignment Pay" and "Temporary Substitution Pay."  (Administrative Procedure Memo, att. G to Garcia Aff., D.E. 18-3).

occurred but received a memo describing the change on December 1, 2005 (Memo, att. B to Affidavit of Emily Martinez, D.E. 18-4, p. 5).

In the spring or summer of 2005 plaintiff complained to her immediate supervisor, Danny Ybarra, that she believed she was being discriminated against based on her race. Ybarra told her that she was better off keeping her head down and doing her work (Amd. Compl., D.E. 5, p. 3; Deposition of Regina Lee, Vol. 1, D.E. 18-1, pp. 24-25).

In November 2005 plaintiff spoke with Leon Bazar, the head of the City's Human Relations department, and told him she believed she was being subjected to racial discrimination (Lee Depo., Vol. 2, D.E. 19-2, pp. 12-14; Deposition of Leonides Bazar, D.E. 19-6, pp. 37-40).  Bazar did not take any action other than telling assistant city manager Massey that plaintiff needed to speak to him (Bazar Depo., D.E. 19-6, p. 37). Plaintiff met with Massey and he suggested that one way to remedy the situation would be to implement a Unified Support Staff (Lee Depo., Vol. 2, D.E. 19-2, pp. 170-171).  He asked plaintiff to prepare a proposal for the position and she did so (Lee Depo., Vol. 1, D.E. 19-1, p. 49).  The position was then given to M.P.  Shudhakaran, the non-African-American director of the City water laboratory (Id.).  Shudhakaran in turn delegated the duties of the position to plaintiff (Id. at 52).  Shudhakaran did not receive a pay increase when he was assigned the supervision duties (Id. at 49-53).

After plaintiff told Ybarra and Massey that Garana was discriminating against her based on race, plaintiff asserts that the City retaliated against her in a number of ways: (1) Plaintiff had been assigned to investigate an unrelated complaint where someone in the

6

workplace had used the "N" word.  When Garana learned of the nature of the complaint, he took plaintiff off the investigation (Id. at 40, 41); (2) Plaintiff heard another employee comment, "Ed will never pay her.  She's just a token."  Plaintiff reported the comment to Garana (Id. at 42-43); (3) Garana isolated plaintiff by not allowing her to attend meetings, not interacting with her, telling her not to talk to supervisors or managers within the water department and telling other employees not to interact with her (Lee Depo., Vol. 1, D.E. 18-1, pp. 123-124; Vol. 2, D.E. 18-2, p. 66); (4) Garana reassigned some of her duties to other employees (Lee Depo., Vol. 2, D.E. 18-2, p. 67); (5) Garana did not approve additional pay for plaintiff when she completed duties outside her assignment (Id. at 68); (6) Garana gave plaintiff a low performance evaluation which resulted in a lower increase in merit pay (Lee Aff., D.E. 19, para. 28).

In September 2006 the City received an anonymous e-mail alleging that plaintiff was being treated in a discriminatory fashion (E-mail dated September 8, 2006, D.E. 18-5, p. 1).  The writer said Garana was treating plaintiff in a manner that was offensive to some of the other managers but they were afraid to speak up.  The writer believed that plaintiff was being treated poorly because of her race (Id. at 2).

Because of the anonymous complaint, the human resources department began an investigation into the allegations.  Ruthie Caraway, senior human resources analyst for the City, was assigned to conduct the investigation (Affidavit of Ruthie Carraway, D.E. 19-8, paras. 1-6).  Carraway interviewed plaintiff, Garana, Marie de la Pena, Danny Ybarra, Mucio Garza, Valerie Gray and Foster Cromwell (Id. at para. 9).

7

Caraway concluded that Garana had discriminated against plaintiff when he purposefully isolated her and stripped her of some of her duties (Id. at para. 10). Although Garana treated other employees rudely at times, he did not treat any other non-African-American employee as harshly or for as long a period of time as he did plaintiff. In addition, some of the other employees were promoted or awarded additional pay by Garana, but plaintiff was not.  Also, plaintiff's pay was lower than that of other comparable employees.  Caraway submitted written findings in a report she submitted to Garcia in April 2007 (Id. at paras. 11-13).

Attached to Caraway's affidavit was a copy of the memo she prepared.  The copy is dated August 16, 2007 although she completed it in April 2007 and the pages on which she included her findings are blank.  Caraway believes that the copy was prepared in August as part of a response prepared by the City to plaintiff's EEOC charge (Id. at paras. 14-16).  At the time Caraway prepared her report, she told Garcia that it was clear that Garana had discriminated against plaintiff and perceived her as an "uppity Black woman." (Id. at para. 17).

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on May 8, 2007, alleging discrimination based on race and retaliation.  She alleged that the earliest date of discrimination was January 3, 2005 and the latest was January 1, 2007 and stated that the discrimination was continual (EEOC Charge, Ex. J to Resp. to Mo. for Sum. Jmt., D.E. 19-10, p. 2).  Plaintiff received her "right-to-sue" letter on May 21, 2009 (D.E. 5, para. 33).

8

In June 2007 plaintiff applied for the position of planner/scheduler.  Although plaintiff was qualified for the job, Marie de la Pena, an Hispanic woman whom plaintiff had trained, was selected for the position.  Plaintiff was told that de la Pena had been preselected for the job (Lee Aff., D.E. 19-3, para. 15).

Garana retired on August 15, 2007 (Emp. Leave and Term form, Garcia Aff., Att. K, D.E. 18-3, p. 103).  After Garana left, Angel Escobar took over the position and plaintiff was allowed to attend meetings and her co-workers were allowed to talk to her (Lee Aff., D.E. 19-3, para. 16).  On January 22, 2008 plaintiff was promoted to the position of Superintendent of Administration in the Water Utilities Support Services Group.  She received a 15-percent increase in her annual salary from $42,544 to $48,926 (Interoffice Memo, Lee Aff., Att. D, D.E. 19-3, p. 13).  She performed the same duties as Superintendent of Administration that she had as Administrative Manager, with the addition of supervising a few more employees (Lee Aff., D.E. 19-3, para. 11, Atts. B and C).  Plaintiff's duties had never been confined to the SBP program.  She did human resource duties for all employees, including conducting investigations, assisting employees with paperwork on a variety of issues and training employees (Lee. Aff., D.E. 19-3, para. 12).

When plaintiff was promoted to the position of Superintendent of Administration, she was not allowed to negotiate her salary although she had requested an opportunity to do so (Id. at para. 18).  Although she received a raise, she is the lowest paid superintendent (Id. at para. 17).  In December 2008 Escobar told plaintiff that he knew

that Garana had treated her unfairly and suggested that she was entitled to a 10-percent salary increase and perhaps backpay.  She was never given the additional compensation (Id. at para. 18).

In May 2010 plaintiff provided her confidential username and password to the City so that it could review the work she had done for the last seven years.  On June 8, 2010, plaintiff discovered that after defendant accessed her computer, all of the documents on the computer were erased, which has significantly hindered her ability to do her job.  She is having to recreate documents which has caused her to be unable to respond adequately to requests and assignments from the departments she serves.  She has inquired and been told that the information would not be restored to her computer and that the drive had been destroyed (Id. at para. 19).

Plaintiff filed this lawsuit on August 5, 2009.  She alleges that her rights have been violated under 42 U.S.C. § 1983 because she has not been fairly paid for her work and because she did not receive a promotion based on her race.  Plaintiff also alleges that her rights to make and enforce a contract were violated under 42 U.S.C. § 1981.  In addition, plaintiff alleges she was subjected to racial discrimination and retaliation for engaging in protected activity in violation of Title VII.

In its motion for summary judgment, defendant argues that plaintiff's claims are barred by the statute of limitations and that even if they were not, the claims are without merit under applicable law.  Plaintiff counters that some of her claims are timely under the four-year statute of limitations found in 42 U.S.C. § 1981 and that others are timely

under the two-year statute of limitations found in 42 U.S.C. § 1983.  Plaintiff also argues

that her Title VII claims are timely under the "continuing violation" doctrine and that

even if the some of the claims fall outside the limitations period, they are relevant as

background evidence.  Plaintiff also argues that she is entitled to relief on the merits.

## APPLICABLE LAW

### A.  Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  See FED.R.CIV.P. 56(c).

An issue is material if its resolution could affect the outcome of the action.  Daniels v.

City of Arlington, 246 F.3d 500, 502 (5th Cir.), cert. denied, 122 S. Ct. 347 (2001).  The

Court must examine "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512,

91 L.Ed.2d 202 (1986).  In making this determination, the Court must consider the record

as a whole by reviewing all pleadings, depositions, affidavits and admissions on file,

drawing all justifiable inferences in favor of the party opposing the motions.  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89

L.Ed.2d 538 (1986).  The Court will not weigh the evidence or evaluate the credibility of

witnesses.  Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The movant bears the initial burden of showing the absence of a genuine issue of

material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91

L.Ed.2d 265 (1986).  If the movant demonstrates there is an absence of evidence to support the nonmovant's case, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  To sustain this burden, the nonmovant cannot rest on the mere allegations of the pleadings.  See Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Caboni, 278 F.3d at 451; FED.R.CIV.P. 56(e).  After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted.  Caboni, 278 F.3d at 451.

## B.  Statute of Limitations

### 1.  Title VII

In states like Texas where there is a state agency with the authority to grant or seek relief for discriminatory employment practices, in order to maintain a Title VII claim, a plaintiff must file a charge of discrimination with the EEOC within "three hundred days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); Huckabay v. Moore, 142 F.3d 233, 238 (5th Cir. 1998).  Plaintiff filed her EEOC charge on May 8, 2007.  Accordingly, any action about which she complains would have had to happen within the 300 days preceding that day, or no earlier than July 12, 2006.

Under certain circumstances, Title VII plaintiffs are not limited to filing suit on events that fall within the statutory time frame because the claim is comprised of a series of separate acts that collectively constitute an unlawful employment practice.  Stewart v. Mississippi Transportation Comm., 586 F.3d 321, 328 (5th Cir. 2009)(citing National

R.R. Passsenger Corp v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 2074, 153 L.Ed.2d 106 (2002)).  Generally, though, the continuing violations doctrine is limited to hostile environment claims.  "Discrete acts such as termination, failure to promote, denial of transfer or refusal to hire are easy to identify."  Morgan, 536 U.S. at 114, 122 S.Ct. at 2073.  Hostile environment claims are different because their very nature involves repeated conduct.  Id., 536 U.S. at 115, 122 S.Ct. 2061.

Any discrete act alleged by plaintiff must have occurred no earlier than July 12, 2006.  Therefore, any Title VII claim she has arising from her initial hiring is barred by limitations, as is her claim that her title was changed in 2005 from Administrative Manager to Superintendent of Administration.  Plaintiff's submission of the JDQ to the JET asking for her position to be reclassified concluded in December 2004 with the JET taking no action.  Any cause of action related to that set of circumstances is barred by limitations.  Similarly, plaintiff's claim that she was not paid for the re-engineering work is barred because she stopped work on that project in January 2005.

Conversely, plaintiff's claim that she was not selected for the position of planner/scheduler is based on events that occurred in June 2007 and is not barred by the statute of limitations.  Also, plaintiff found out in August 2006 that Shudhakaran had been assigned to the Unified Support Staff (Amd. Complaint, D.E. 5, p. 4; Caraway Report, Att. A to Caraway Aff.,  D.E. 19-8, p. 11).  Similarly, plaintiff's claim that she was not allowed to negotiate her salary occurred within the limitations period.  In addition, plaintiff claims that as of her promotion to superintendent in February 2008, she

13

was and continues to be the lowest paid superintendent in her department.  Finally, the

destruction of the information on plaintiff's hard drive occurred in May 2010.  None of

these claims is barred by the statute of limitations and each will be addressed as a discrete

cause of action below.

Plaintiff's remaining claims are best characterized as hostile environment

retaliation claims stemming from her complaints in the spring or summer of 2005 to

Ybarra, her immediate supervisor, that she was being treated in a racially discriminatory

fashion.  A court may consider "'the entire scope of the hostile work environment

claim,'" including behavior that occurred outside the 300-day window, "'so long as any

act contributing to that hostile environment takes place within the statutory time period.'"

Id., (citing Morgan, 536 U.S. at 105, 122 S.Ct. at 2068).  However, the plaintiff must

demonstrate more than a series of discriminatory acts.  "He must show an organized

scheme leading to and including a present violation . . . such that it is the cumulative

effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to

the cause of action."  Huckabay, 142 F.3d at 239 (citations omitted).  Moreover, even

with a continuing violation, the statutory time begins to run when "facts supportive of a

Title VII charge or civil rights action are or should be apparent to a reasonably prudent

person similarly situated."  Glass v. Petro-Tex Chem. Corp., 757 F.2d 1554, 1561 (5th

Cir. 1985).

After plaintiff reported to her immediate supervisor that she believed Garana was

treating her poorly based on her race, the following occurred: (1) Her job title was

changed in the City's computer system from Superintendent of Administration to Administrative Manager without plaintiff's knowledge; (2) Plaintiff emailed Garana that Massey wanted her to resubmit her reclassification request but Garana declined to meet with her; (3) Garana informed plaintiff that some of her job duties had been reassigned to Max Castaneda; (4) Garana told Garcia, Martinez and Massey that he never intended to make plaintiff a Superintendent; (5) In January 2006, after Ybarra rated plaintiff highly in a job evaluation, Garana reevaluated her and rated her lower.  Plaintiff was the only person Garana reevaluated and he never met with her to discuss the evaluation; (6) Mucio Garza emailed plaintiff and other employees telling them that they were required to follow a chain of command before talking to plaintiff (Caraway Report, Att. A. to Caraway Aff., D.E. 19-8, p. 11, paras 25-41); (7) Garana continued to isolate plaintiff and exclude her from meetings in the water department until he retired in August 2007 (Lee Depo., Vol. 2, D.E. 19-2, p. 78)

With the exception of the continued isolation and exclusion from meetings, none of the acts that plaintiff attributed to Garana occurred within the 300-day limitations period.  Moreover, plaintiff had sufficient knowledge at least as early as 2005 and certainly by the time Garana reevaluated her in 2006 of facts supportive of a Title VII charge or civil rights action.  Even though plaintiff is asserting that the statute of limitations is subject to the continuing violations doctrine, a reasonably prudent employee would have been put on notice that her rights were being violated prior to July 12, 2006. Accordingly, except for her claim that she was isolated and excluded from meetings,

plaintiff's retaliation and/or hostile environment claims based on these acts are time-barred under Title VII.  Nevertheless, plaintiff may refer to the acts as background information in support of her timely claims.  Morgan, 536 U.S. at 113, 122 S.Ct. at 2072.

Plaintiff also asserts that she was taken off an investigation of another employee which involved someone using the "N-word" at work and also that a co-worker referred to plaintiff as a "token."  It is unclear when either of these actions occurred and it is unclear whether plaintiff is asserting them as hostile environment race claims or retaliation claims.  Because defendant is asserting the affirmative defense of limitations and has not shown that these actions occurred outside the limitations period, the actions will be found to be timely for purposes of this summary judgment motion and addressed below.

### 2.  42 U.S.C. § 1981

As a municipal employee, plaintiff cannot bring a §1981 claim against the City. Felton v. Polles, 315 F.3d 470, 482 (5th Cir. 2002)(limited on other grounds); Oden v. Oktibbhea County, Miss., 246 F.3d 458, 463 (5th Cir. 2001).  In Oden the court held that a county employee could not maintain an *independent* cause of action under § 1981 against the county.  First, the court noted the holding in Jett v. Dallas Independent School District, 491 U.S. 701, 731, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), that § 1981 does not provide a separate cause of action against local government entities.  Instead, plaintiffs must assert a cause of action against state actors through § 1983 to remedy violations of civil rights under § 1981.  Oden, 246 F.3d at 462-463.  Then, the court made clear that the

1991 amendments to § 1981 did not create a remedial cause of action against local government entities and that the conclusion in <u>Jett</u> had not been altered.  <u>Oden</u>, 246 F.3d at 463.

In addition, the <u>Oden</u> court held that "when a plaintiff asserts a cause of action under § 1981 for discrimination in the terms and conditions of a municipal employment contract, the proper defendant is the government employer in his official capacity."  <u>Id.</u> at 464.  Individual municipal employees are not liable under § 1981.  <u>Id.</u>  <u>See also</u> discussion in <u>Felton</u>, 315 F.3d at 480-483.

Plaintiff in this case has not asserted an independent cause of action under § 1981.  Rather in her amended complaint, plaintiff brings a § 1983 action claiming that "Defendant's actions, customs and/or policies denied Plaintiff the right to make and enforce contracts including the right to the performance of a contract and the enjoyment of all the benefits of the contractual relationship under 42 U.S.C. § 1981." (First Amd. Orig. Compl., D.E. 5, para. 37).  Nor has plaintiff asserted a cause of action against any municipal employee in his individual capacity.  The only defendant she names is the City of Corpus Christi.

Although plaintiff argues that the § 1981 four-year statute of limitations discussed in <u>Jones v. R.R. Donnelley & Sons Company</u>, 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004), applies in her case, it does not.  Because, in accordance with <u>Oden</u>, plaintiff is not asserting an independent cause of action under § 1981, but bringing it

through her § 1983 cause of action, the relevant statute of limitations is that which applies to § 1983 causes of action.

### 3.  42 U.S.C. § 1983

The statute of limitations for a suit brought under § 1983 is determined by the general statute of limitations governing personal injuries in the forum state.  <u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 576 (5th Cir. 2001).  Because Texas has a two-year statute of limitations for personal injury claims, plaintiff had two years to file a § 1983 action from the date her claim accrued.  <u>Id.</u> (citations omitted).  Any § 1983 cause of action of plaintiff's which accrued after August 5, 2007 is timely.

## C.  Merits

### 1.  Title VII

Under Title VII, it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin or age.  42 U.S.C.A. § 2000e-2; 29 U.S.C.A. § 623.  The analysis of a Title VII case is well known:

> The plaintiff must establish a prima facie case that the defendant made an employment decision that was motivated by a protected factor.  Once established, the defendant bears the burden of producing evidence that its employment decision was based on a legitimate nondiscriminatory reason.  The burden then shifts back to the plaintiff to prove that the defendant's proffered reasons were a pretext for discrimination.  But, if the defendant has offered a legitimate nondiscriminatory reason for its action, the presumption of discrimination derived from the plaintiff's prima facie case 'simply drops out of the picture,' . . .and 'the ultimate question [is] discrimination *vel non*.'

18

Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1089-90 (5th Cir. 1995)(citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 246, 253-257, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981);  McDonnell Douglas Corporation v. Green, 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1971)).

The focus then shifts to the ultimate question of whether the defendant intentionally discriminated against the plaintiff.  Grimes v. Tx. Dept. of Mental Health, 102 F.3d 137, 140 (5th Cir. 1996)(citing Hicks, 509 U.S. 502, 510-511, 113 S.Ct. 2742, 2749, 124 L.Ed.2d 407 (1993)).  Title VII plaintiffs must ordinarily prove their claims through circumstantial evidence and may do so by demonstrating that a defendant's articulated non-discriminatory reason was pretextual.  Grimes, 102 F.3d at 141 (citations omitted).  A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may, but does not necessarily, permit the trier of fact to conclude that the employer unlawfully discriminated.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Id., 530 U.S. at 148-149, 120 S.Ct. at 2109.

In order to make out a prima facie case under Title VII for failure to select or promote, a plaintiff must show that (1) she belongs to a protected class;  (2) she was qualified for the position sought;  (3) she was not selected; and (4) she was replaced by someone outside of the protected class. See McClaren v. Morrison Management Specialists, Inc., 420 F.3d 457, 462 (5th Cir. 420 F.3d 457, 462, 463 (5th Cir. 2005) (discussing prima facie case under the TCHRA in a non-selection case, which parallels federal discrimination laws); Blow v. City of San Antonio, 236 F.3d 293, 296 (5th Cir. 2001)(prima facie case for failure to promote).

**a.  Selection to Position of Planner/Scheduler**

Plaintiff is African-American and she was qualified for the position of planner/scheduler but the position was awarded to someone outside her protected class. Accordingly, she has made out a prima facie claim of race discrimination.

Plaintiff and the other two finalists for the position were interviewed by a three-person panel, who asked each applicant the same questions and then ranked them according to their answers (Lee Depo., Vol. 1, D.E. 18-1, pp. 55-56).  Defendant argues that Marie de la Pena was selected for the position because she was better qualified. Specifically, defendant asserts that de la Pena was more experienced in the use of the Peoplesoft Financial system, the H.T.E. System and the MXES System.  Her experience included maintaining and providing information on performance measures for the BSC User, trainer, tester, troubleshooter, and H.T.E. Systems, experience as Project Manager for the AMR project, renewing and analyzing complex purchasing requisitions and

20

meeting with contractors for supplies, equipment and services for the Water Department. In contrast, plaintiff's experience was limited to the MXES as it related specifically to skill based pay (Garcia Aff., D.E. 18-3, pp. 4-5).

Because defendant has offered a legitimate, non-discriminatory reason for choosing de la Pena over plaintiff, the burden shifts to plaintiff to show that the proffered reason was a pretext for discrimination. She may do so either by showing that she was clearly better qualified for the position or by showing that the City's explanation is false or unworthy of credence. Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc., 482 F.3d 408, 412 (5th Cir. 2007)(citing Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003)).

Plaintiff asserts that she had more education that de la Pena and that she trained de la Pena on Maximo (Lee Aff., D.E. 19-3, p. 6). This evidence is simply insufficient to show that she was better qualified for the position. In order to make such a showing, plaintiff must present evidence that "[t]he disparities in qualifications [are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Deines v. Texas Department of Protective and Regulatory Services, 164 F.3d 277, 280-281 (5th Cir. 1999). Plaintiff has failed to present evidence sufficient to make such a showing.

Plaintiff further argues that she can prove pretext by showing that the proffered reason for a decision is unworthy of credence. An employer's explanation is false or unworthy of credence if it is not the real reason for the employment action. Burrell, 482 F.3d at 412.

21

Plaintiff asserts that Garana and Massey had told her that de la Pena would be chosen for the position before the interview and that Garana chose the three interview panel members, two of whom worked under his supervision.  During plaintiff's interview with the panel, none of the interviewers took notes.  In addition, plaintiff points out that Martinez, one of the panel members, testified that by the time plaintiff was interviewed for the position, she had come to believe that plaintiff's attempts at reclassification were irresponsible and a waste of tax payer money and that directors get what they want.  Also, plaintiff asserts that Garana had shown racial animus toward another African-American employee, Jeremy Scott.

Regarding plaintiff's assertion that Garana told her that de la Pena would be chosen for the position, Garana did not make the decision regarding who was hired for the planner/scheduler position.  The three-member panel made the decision.  Plaintiff implies that Garana influenced the panel because two of the members were supervised by him, but she does not provide any evidence to support the implication.

In Russell v. McKinney Hospital Venture, 235 F.3d 219, 227-228 (5th Cir. 2000), Russell presented evidence that the supervisor who terminated her was the "cat's paw" for a co-worker who had exhibited age bias toward her:  The co-worker was the son of an executive of the company and gave the supervisor an ultimatum that he would quit if the supervisor did not fire Russell; the co-worker's father controlled the supervisor's budget; the supervisor went crying to her assistant immediately after the ultimatum was issued; before the ultimatum the supervisor had commented that she was not going to lose her job

over the friction between Russell and the co-worker and the co-worker received "perks" that other employees did not.  Id. at 28.  The court held that a jury could find that the co-worker, who had exhibited age-based animus, had contributed significantly to the employee's termination.  Id.  See also Gee v. Principi, 289 F.3d 342, 346 (5th Cir. 2002)(citations omitted)(When asserting that someone other than final decision-maker exerted influence over the employment decision, the ultimate question is whether the employee can demonstrate that the other had influence or leverage over the official decision maker).

In this case plaintiff has failed to put on any evidence that Garana exerted any influence over the decision-making panel.  Without doing so, she cannot show that he caused the panel to vote against her for the position.  Nor does the fact that the interviewers did not take any notes indicate that they were operating on Garana's orders or out of racial animus.  The evidence is insufficient to lead to such a conclusion.

Regarding Martinez's statement that she thought plaintiff's efforts to have her job reclassified were irresponsible and a waste of taxpayers' money (Martinez Depo., D.E. 19-4, pp. 136-139), her comments did not evince any racial bias.

> ...I felt that Ms. Lee had an idea of the job that she wanted to be in as opposed to the job that she was actually hired to do.  And I think the amount of time spent on that was unnecessary, if, after the first attempt, that was no – for whatever the reasons with the job description, I think that an employee, the best use of the City's taxpayer dollars is to do your job.  And the idea of somebody insisting or wanting to be at a higher level, unfortunately, is not always the case.
>
> We may think that we deserve to be at a level.  We may believe that we can best serve the City in that capacity, but that is not the case if that is not the position that

23

we've been hired for.  So I have very strong beliefs about, you know, the
responsibility of municipal employees.

(Martinez Depo., D.E. 19-4, pp. 136-137).  To the extent Martinez had developed an

opinion about plaintiff and her attempts to have her position reclassified prior to the job

interview, the record does show that her opinion was motivated by racial bias.

Finally, plaintiff's assertion that Garana exhibited racial bias toward another

employee, Jeremy Scott, is insufficient on two bases to show that the proffered reason for

choosing de la Pena over plaintiff was a pretext for discrimination.  First, the assertion is

nothing more than a conclusory allegation.  Scott asserts that he was entitled to a pay

increase but never received one and he attributes the lack of increase to Garana's racial

animosity (Affidavit of Jeremy Scott, D.E. 25-1, para. 21).  There has been no

determination that Scott was denied the pay increase because of racial discrimination.

"Mere conclusory allegations are insufficient to defeat summary judgment."  Moss v.

BMC Software, Inc., 610 F.3d 917, 922 (5th Cir. 2010).  Second, as discussed above,

plaintiff has not provided evidence to show that Garana manipulated the outcome of the

selection for the planner/scheduler position.  For all of these reasons, summary judgment

is entered for defendant on plaintiff's claim that she suffered racial discrimination when

she was not chosen for the position of planner/scheduler.

**b.  Position with Unified Support Staff**

Plaintiff asserts that she met with Massey in early 2006 and he indicated that he

was aware of her allegations against Garana.  Massey believed the situation could be

addressed by placing plaintiff in a position which involved supervision of the Unified

Support Staff.  He asked plaintiff to create a proposal for a position in Unified Support

Staff and she did so (Lee Depo., Vol. 1, 19-1, pp. 49-50).  Plaintiff was not given the

position.  Instead, Shudhakaran, the director of the City's water lab, was given the

position.  Shudakharan did not receive an increase in pay or pay grade.  Rather, he just

assumed the duties of supervising the Unified Support Staff and promptly designated

those duties to plaintiff (Id. at 49-52).  The City did not advertise the position and no one

applied for it (Id. at 52).

Plaintiff has stated a prima facie case of discrimination because she was qualified

for the position but it was given to someone outside her protected class.[3]  The burden

shifts to defendant to explain why Shudhakaran was chosen over plaintiff.  Garana stated

that he gave Shudhakaran the position because he wanted someone neutral and because

plaintiff "had too much on her plate." (Caraway Report, Att. A to Caraway Aff., D.E. 19-

8, para. 6).  Garcia stated that supervision of the Unified Support Staff was an additional

duty and did not involve a grade increase or pay raise.  Had a new supervisory position

been created, there is no way to know who would have applied or been chosen for it

(Garcia Aff., D.E. 18-3, para. 7).

---

[3]It is recognized that these facts present an odd situation.  Plaintiff sought
additional responsibilities, which were given to another employee without an
accompanying pay increase, who in turn gave the responsibilities to plaintiff, also without
a pay increase.  Plaintiff received the responsibilities, but did not receive a new title and
no one received a pay increase.  Nevertheless, the issue will be addressed using the Title
VII analysis.

Plaintiff has not presented evidence that she was more qualified than Shudhakaran for the position.  Instead, she argues that defendant has offered different reasons for giving the position to Shudhakaran--Garana's explanation and Garcia's explanation--and that when an employer offers inconsistent explanations for its employment decisions at different times, the jury may infer that the reasons are pretextual, citing in support <u>Gee</u>, 289 F.3d at 347-348 and <u>Russell</u>, 235 F.3d at 225.  Plaintiff's recitation of the law is correct, but the two statements are not inconsistent with one another.  Garana made the decision to assign the responsibilities to Shudhakaran and gave his reasons for doing so.  Garcia was pointing out that because the added responsibilities were not considered a promotion by the City, no position was created as such and Shudhakaran did not receive an increase in pay along with the added responsibilities.  These explanations are not inconsistent with one another.

Moreover, Garana's explanation is reasonable given the fact that plaintiff had been complaining that she was working outside of her job classification and needed additional compensation.  Because funding for the increased responsibilities was not allocated in the budget, Garana could easily have believed it would have exacerbated plaintiff's complaints had he assigned her the additional duties.  Ultimately, plaintiff was given the responsibilities she sought, albeit without a pay increase.  Based on these facts, plaintiff has not shown that a fact issue exists regarding discrimination based on the Unified Support Staff position.

### c.  Salary Negotiation

Plaintiff argues that when she received her promotion to Superintendent of Administration in 2008 she was not allowed to negotiate her salary increase.  Plaintiff received a 15-percent pay increase when she received the promotion.  Martinez and Garcia acknowledged that if employees want an increase greater than that allowed by City policies, they can seek approval for the increase from the City Manager (Martinez Depo., D.E. 19-4, pp. 42-43; Garcia Depo., D.E. 19-5, pp. 185-187).  Garcia also acknowledged that plaintiff could have received up to a 20-percent increase if she had relevant experience with a prior employer (Garcia Depo, D.E. 19-5, p. 192).

Plaintiff does not point to anyone outside her protected class who was allowed to negotiate a pay increase.  Without doing so, she cannot make out a prima facie case that she was discriminated against in this regard.  Accordingly, summary judgment is entered for defendant on this issue.

### d.  Lowest Paid Superintendent

Plaintiff argues that she is the lowest paid superintendent in the Water, Wastewater, Stormwater and Environmental Services departments of the City.  Documents show that her assertion is true.  There are 11 superintendents in the division and plaintiff is the only African-American (Ex. P to Resp. to Mo. for Sum. Jmt., D.E. 19-16, p. 2).  When plaintiff was promoted to superintendent in February 2008 her salary was $48,925.  As of March 29, 2010, plaintiff was making $50,148 annually (Lee salary history, Ex. P. to Resp. to Mo. for Sum Jmt., D.E. 19-16, p. 3).

27

The next lowest paid superintendent is Margaret Castaneda, who makes $60,459 annually (Castaneda salary history, Ex. P. to Resp. to Mo. for Sum. Jmt., D.E. 19-16, p. 13). The highest paid superintendent is Ivan Luna, who makes $73,799 annually (Luna salary history, Ex. P. to Resp. to Mo. for Sum. Jmt., D.E. 19-16, p. 5). Randal Stivers, who started a year before plaintiff in March 2007, had a starting salary of $59,999 and a current salary of $70,946. Charles Baish, who also started approximately one year before plaintiff, had a starting salary of $64,740 and a current salary of $68,349 (Baish salary history, Ex. P. to Resp. to Mo. for Sum. Jmt., D.E. 19-16, p. 9).

Plaintiff asserted in her complaint that because of discrimination, her pay is well below what it should have been and below that of comparable employees. Defendant did not address this claim, other than to point out that one superintendent, Steve Klepper, has been an employee of the City since 1999 and has been a grade 616 since July 2002. Defendant argues that Klepper receives more pay than plaintiff because he has more experience and longevity than plaintiff. While that may be true, when Klepper started at pay grade 616 in 2000, he was making $57,502, or approximately $7,000 more annually than plaintiff when she started in 2008 (Klepper salary history, Ex. P. to Resp. to Mo. for Sum. Jmt., D.E. 19-16, p. 7).

Plaintiff has made out a prima facie case of race discrimination based on inequality of pay and defendant has failed to put forth a legitimate, non-discriminatory reason for the discrepancies in salaries between plaintiff and the other superintendents in her department. Accordingly, summary judgment is denied on this issue.

28

### e.  Hostile Environment

Plaintiff brings two claims that are best characterized as hostile environment

claims.  To state a claim for hostile environment race discrimination, one must show that

she belongs to a protected group, was subject to unwelcome racial harassment, the

harassment was based upon race; the harassment affected a term, condition or privilege of

employment and the employer knew or should have known of the harassment and failed

to take prompt remedial action.  Waltman v. International Paper Co., 875 F.2d 468, 477

(5th Cir. 1989)(citing Jones v. Flagship International, 793 F.2d 714, 719-720 (5th Cir.

1986)).

A plaintiff must show that the harassment was sufficiently severe or pervasive to

alter the conditions of the complainant's employment and create an abusive working

environment.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405,

91 L.Ed.2d 295 (1986);  Walker v. Thompson, 214 F.3d 615, 625 (5th Cir. 2000).  He

need not show that the conduct seriously affected his well-being or led him to suffer

injury, but that the environment would reasonably be perceived and is perceived as hostile

or abusive.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 114 S.Ct. 367, 371, 126

L.Ed. 2d 295 (1993)(citing Meritor, 477 U.S. at 67, 106 S.Ct. at 2405)).

The court looks at the frequency of the conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.  Harris, 510 U.S. at 23,

114 S.Ct. at 371.  In the Fifth Circuit, discriminatory verbal intimidation, ridicule and

insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Walker, 214 F.3d at 626 (citing Wallace v. Texas Tech University, 80 F.3d 1042, 1049 n. 9 (5th Cir. 1996)). However, the mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. Harris, 510 U.S. at 21, 114 S.Ct. at 370.

**(1) "N-word" Investigation**

Plaintiff asserts that Garana took her off an investigation of a situation where an employee was accused of using the "N-word" and that the only reason he did so was because he associated her with the word. Plaintiff claims that Garana had a meeting with other managers and told them that if plaintiff had heard the word then he had to do something about it and reassigned the work (Lee Depo., Vol. 1, D.E. 18-1, pp. 40-41). This claim is simply too vague and attenuated to rise to the level of a hostile environment claim. Summary judgment is entered for defendant on this claim.

**(2) "Token"**

Plaintiff avers that she overheard a conversation in which a coworker said, referring to plaintiff, "Ed will never pay her. She's just a token." (Lee Depo., Vol. 1, D.E. 18-1, pp. 42-43). At most, this comment would be a mere offensive utterance. Moreover, although offensive, it would seem to support some of plaintiff's other complaints that she was not properly compensated for the work she was doing for the

30

City.  In any event, the comment does not rise to the level of hostile environment racial

harassment and judgment is entered for the City on this claim.

### 2.  Retaliation

In addition to barring discrimination in the workplace based on race, color,

religion, sex or national origin, Title VII also forbids an employer from discriminating

against an employee because that individual opposed any practice made unlawful by Title

VII, or made a charge, testified, assisted, or participated in a Title VII proceeding or

investigation.  42 U.S.C. § 2000e-3(a).  The Supreme Court held in Burlington Northern

& Santa Fe Railway Co. v White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006),

that the anti-retaliation provision does not confine the actions and harms it forbids to

those that are related to employment or occur at the workplace.  The Court also concluded

that the provision covers those employer actions that would have been materially adverse

to a reasonable employee.  Id., 548 U.S. at 57, 126 S.Ct. at 2409.  The Court specifically

rejected the Fifth Circuit holding in Mattern v. Eastman Kodak Co., 104 F.3d 702, 707

(5th Cir. 1997), which limited retaliation claims to so-called "ultimate employment

decisions." White, 548 U.S. at 67, 126 S.Ct. at 2414.  Instead, the Court defined

"materially adverse" actions as those actions which, in the context of a particular case,

were harmful to the point that they could well dissuade a reasonable worker from making

or supporting a charge of discrimination.  Id., 548 U.S. at 68, 126 S.Ct. at 2415.

The Court went on to note that it was important to separate significant from trivial

harms, because Title VII does not set forth a general civility code for the American

workplace.  Id. (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118

S.Ct. 998, 140 L.Ed.2d 201 (1998).  An employee's decision to report discriminatory

behavior does not immunize that employee from petty slights and minor annoyances that

often take place at work and that all employees experience.  Rather, the Title VII

retaliation provisions prohibit employer actions that are likely to deter victims of

discrimination from complaining to the EEOC, the courts and their employers.  Id. (citing

Robinson v. Shell Oil, 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).

### a.  Isolation and Exclusion

Plaintiff claims that she was retaliated against by being isolated from her

coworkers and excluded from meetings.  She testified that there was an established

weekly managers' meeting and she was specifically directed not to attend it and that the

order for her not to attend the meetings came after she complained about racial

discrimination (Lee Depo., Vol. 1, D.E. 18-1, pp. 90-91; Caraway Report, Att. A to

Caraway Aff., D.E. 19-8, p. 11).  Plaintiff also avers that her co-workers were told not to

talk to her or be seen with her (Lee Depo.,Vol. 1, D.E. 18 pp. 123-124).

Defendant argues that the isolation and exclusion was not severe enough to satisfy

the "materially adverse" requirement of Burlington and that the actions more resemble

those discussed in Stewart, 586 F.3d at 326, 331.  In Stewart, an employee claimed

retaliation when, after reporting sexual harassment, she was transferred and her work load

increased, personal items were taken from her desk, other employees were told not to

fraternize with her, she was not allowed to close her office door and the locks were

changed, she was chastised by her superiors and she was not invited to functions with the other secretaries.  Id.  The court held that as a matter of law, the taking of the items from her desk, changing of the locks on her door and the chastisement and ostracism did not rise to the level of material adversity.  Id. at 331-332.

Plaintiff in this case testified that the isolation and exclusion from the meetings caused her to be unable to obtain information she needed to do her job and she had to work based on what little information she received by other means (Lee Depo., Vol. 2, D.E. 19-2, p. 78).  Excluding plaintiff from meetings she needed to attend in order to fulfill the obligations of her position is a more severe act of retaliation than that alleged in Stewart.  It cannot be said as a matter of law that the exclusion and isolation were not materially adverse.  Rather, fact issues exist regarding whether the isolation and exclusion were such that they could dissuade a reasonable worker from making or supporting a charge of discrimination.  Accordingly, summary judgment is denied on this issue.

### b.  Destruction of Computer Files

Plaintiff also complains that all the work on her computer hard drive was destroyed after she gave the City her confidential user name and password so they could access her computer and review the work she had done over the last several years.  Included in the documents were career ladder memos for departmental staff; work coordinator career ladder memos; investigation documents; AWOL terminations; probationary terminations; SBP process documents; interview questions; recruiting information and other memos and documents she used on a daily basis.  Plaintiff asserts

33

that her ability to do her job is significantly hindered and she is unable to complete some of the most basic functions of her job without "recreating the wheel."  She has been informed that the information will not be restored to her computer and that the drive has been destroyed (Lee Aff., D.E. 19-3, para. 19).

Based on these facts, plaintiff has stated a prima facie case of retaliation[4] because the action would be materially adverse to the average employee and could dissuade a reasonable employee from making or supporting a charge of discrimination.  Losing years of accumulated work on a computer would be extremely demoralizing because it would affect tremendously an employee's ability to be efficient and productive in the workplace. Summary judgment is denied on this retaliation claim.

### 2.  42 U.S.C. § 1983 Claims

As discussed above, any of plaintiff's claims which accrued prior to August 5, 2007 are barred by the statute of limitations.  The only claims which fall within the limitations period are her claims that she was not allowed to negotiate her salary when she was promoted in 2008; her claim that as a superintendent she is not paid as much as the non-African-American superintendents in her department and the retaliation claims related to her being isolated and excluded and the destruction of her computer hard drive.

---

[4]A plaintiff need not exhaust administrative remedies prior to asserting a retaliation claim growing out of an earlier charge.  The district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative claim that is properly before the court.  Gupta v. East Texas State University, 654 F.2d 411, 414 (5th Cir. Unit A 1981).

Defendant did not address plaintiff's § 1983 causes of action other than to argue that they were untimely.  Accordingly, summary judgment is denied without prejudice on those four claims to the extent plaintiff asserts them under § 1983.

## CONCLUSION

Based on the foregoing, it is ordered that defendant's motion for summary judgment (D.E. 18) is granted in part and denied in part.  Summary judgment is entered on all of plaintiff's Title VII race discrimination claims either because the claims are barred by the statute of limitations or are without merit, except for her claim that she is being paid less than the other superintendents in her division.  Plaintiff may proceed on that claim.

In addition, all of plaintiff's claims that she suffered retaliation are dismissed as time-barred, except for her claims that she was isolated and prohibited from attending meetings that were necessary for her to do her job and that her computer hard drive was destroyed in retaliation for complaining about discrimination.  Plaintiff may proceed on those claims.

Summary judgment is denied without prejudice on plaintiff's § 1983 claims which accrued after August 5, 2007.

ORDERED this 3rd day of September, 2010.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE